**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**November 30, 2012**

# In the Court of Appeals of Georgia

A12A1484. NUVELL NATIONAL AUTO FINANCE, LLC v.  AD-068
MONROE GUARANTY INSURANCE COMPANY.

A12A1485. NUVELL NATIONAL AUTO FINANCE, LLC v.  AD-069
MONROE GUARANTY INSURANCE COMPANY.

A12A2421. RENAISSANCE RECOVERY SOLUTIONS, LLC v.  AD-117
MONROE GUARANTY INSURANCE COMPANY.

ADAMS, Judge.

At issue in all three of these appeals is the interpretation of a commercial automobile insurance policy, and the appeals have been consolidated for our consideration.

All three appeals also involve either the granting or denying of motions for summary judgment. Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the

evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County,* 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

The basic facts underlying the issue of insurance coverage are not disputed. In brief, Lidie Joseph Clements purchased a 2004 Dodge Ram truck from an Augusta dealership, financed through Nuvell National Auto Finance, LLC (Nuvell). For various reasons, Clements fell behind on his payments and agreed to a voluntary repossession of the truck. Nuvell faxed a request for repossession to Renaissance Recovery Solutions, LLC (Renaissance), a repossession management company with which Nuvell had a contract for repossession services. Monroe Guaranty Insurance Company issued three policies to Renaissance, including the Commercial Auto Policy involved here. On March 1, 2006, Nuvell and Renaissance entered into an indemnity agreement pursuant to which Nuvell was issued a certificate of insurance reflecting Monroe as the insurer. Nuvell, however, was not added to the policy as a named insured.

Renaissance contacted Renovo Services, LLC (Renovo), a repossession company, to pick up the truck. Renovo retained several independent contractors, including Michael Brown, for repossessing vehicles. Renovo owned the wreckers and

2

the drivers leased them on a per job basis. When Brown went to repossess the truck, Clements' friend William Jacobs, Jr. was run over by the tow truck and killed.

In Case No. A12A1484, Pamela Jacobs, individually and on behalf of her deceased husband, sued Michael Brown, Nuvell, Renaissance, and Renovo for wrongful death, wrongful repossession, negligent hiring and retention, and other claims. The Jacobs case proceeded to trial on November 28, 2011, and the jury awarded a verdict of $2.5 million. Judgment was entered accordingly and has been satisfied. Nuvell filed a third party claim against Renaissance and Monroe, claiming it was an insured under the Commercial Auto Policy and that Renaissance had agreed to indemnify it. Nuvell appeals from the trial court's denial of its motion for summary judgment against Monroe and the grant of Monroe's motion for summary judgment on the basis that Nuvell was not an insured.

In Case No. A12A2421, Renaissance appeals from the grant of Monroe's motion for summary judgment and the denial of its motion for partial summary judgment in the Jacobs litigation on the issue of insurance coverage.

In Case No. A12A1485, Cindy Clements, individually and on behalf of her deceased husband Lidie Joseph Clements,[1] sued the same defendants on similar claims, excluding wrongful death. This case was settled in mediation in July 2011, and was dismissed with prejudice on August 12, 2011. Nuvell filed a similar third party claim against Renaissance and Monroe and appeals the trial court's denial of its motion for summary judgment and the grant of Monroe's motion for summary judgment on the basis that Nuvell was not an insured.

In the Jacobs litigation, Nuvell, Renaissance, and Renovo sought partial summary judgment on Jacobs' claim for wrongful repossession. In denying their motions on November 7, 2011, the trial court found that the act of repossession had not ended when Jacobs was run over and that Mrs. Jacobs, although not the debtor, had standing to bring an action for wrongful repossession.[2] In reaching these legal

---

[1] Clements did not die directly from the injuries suffered in the incident, but died later, according to his wife, from the cumulative effects of losing Jacobs, his friend and business partner, and other stressors.

[2] This order was not appealed following entry of final judgment and is final and binding on the parties. *Hall v. Hall*, 240 Ga. 28 (239 SE2d 356) (1977); *Hooper v. Harris*, 236 Ga. App. 651, 652 (1) (512 SE2d 312) (1999).

conclusions, the trial court found the following facts: Clements advised Nuvell on March 30, 2009, to use his cell phone number when contacting him about the voluntary repossession of his truck. On April 7, 2009, Clements advised Nuvell that the truck was located at his residence and that his cell phone number should be used to contact him. On April 9, 2009, Nuvell completed its internal procedures to approve the voluntary surrender and repossession of the truck. At 4:05 p. m., Nuvell made a system entry to assign the repossession to Renaissance, in accordance with the 2006 agreement between the companies which provided "that Renaissance would act as an independent contractor when making vehicle repossessions and recoveries on behalf of Nuvell." At 4:47 p. m., Clovie Zamarripa, a Renaissance employee, attempted to contact Clements on his home phone, got no answer and left no message. At 4:49 p. m., Renaissance assigned recovery of the truck to Renovo, a field repossession company.[3] At 5:11 p. m., Renovo assigned recovery of the truck to Michael Brown pursuant to a February 3, 2009, "Independent Recovery Contractor Agreement."

At 6:32 p. m., while Michael and Victoria Brown, his wife, were sitting in the Renovo-owned tow truck within sight of the Clements residence, Victoria Brown

[3] Renovo Services, LLC is the parent company of both Renovo Services, the repossession company, and Renaissance, the repossession management company. Renaissance and Renovo maintain operations centers in Grand Rapids, Michigan.

5

called Clements on his cell phone and told him a recovery driver was on the way to his residence to pick up the truck. Clements advised that his agreement with Nuvell was that he would have sufficient advance notice to enable him to remove his tool box and other property from the truck. He withdrew his consent for voluntary repossession and told Victoria the repossession driver was not to get the truck but could return the next day. Victoria Brown told Clements that she would recall the driver and send him back the next day. Rather than leave, however, Michael Brown called Renovo and told Renovo the substance of Victoria's conversation with Clements, including the fact that Clements had withdrawn his consent to voluntary repossession. In response to Brown's request for direction, Renovo called Renaissance "and there is some evidence in the record that either Renovo or Renaissance then called Nuvell for further direction . . . but no evidence as to what, if any additional direction Nuvell provided that day." At this point, Pamela Jacobs arrived, parked her van behind Clements' truck, and went inside to visit with Cindy Clements while they awaited the return of their husbands so they could all go to dinner.

Renaissance directed Renovo to instruct Brown to pick up the Clements' truck. Renovo told Brown that the repossession was now involuntary and, according to

6

Brown, he was told "if you see my unit, get it." Renovo's electronic record keeping system reflects an entry evidencing the call from Brown, the direction from Renaissance to Renovo and from Renovo to Brown as follows: "Agent called advising that he spoke to the debtor and he confirmed that the unit is at the given, but said DO NOT pick unit up as he's out of town. Called client Clovie [Zamarippa, a Renaissance employee] and was advised to pick up this unit. Agent will secure and advise." This direction was in direct conflict with Renovo's policies which state a contractor should back off if there is objection to recovering the collateral.

Brown backed the Renovo tow truck down the adjacent street, across Roswell Drive, the street in front of the Clements' home, and across the Clements' front yard so he could attach the tow to the Clements' truck. He began attempting to pull the truck out from between the Clements' house and the Jacobs' van, but every attempt caused the Clements' truck to strike the Jacobs' van, causing damage to both vehicles and a loud banging noise heard throughout the neighborhood. Mrs. Clements went outside in response to the noise and began screaming for Brown to stop tearing up the two vehicles. At some point, Mrs. Clements was knocked to the ground when the passenger door of the tow truck was opened on her. She got up and continued to yell that they would give the truck to them. At this point, Clements and Jacobs drove up

and Clements ran into the front yard to join his wife's protestations. A neighbor observed all of this and heard the Clements both repeatedly offer to voluntarily give up the truck and get the keys if Brown would simply stop damaging both vehicles. Jacobs got out of his truck and either was in the front yard or in the street near his truck. Brown, using an automated release mechanism inside the Renovo tow truck, backed up one last time and released the truck, damaging it. Michael Brown then accelerated across the Clements' front yard and swerved the truck toward Clements and Jacobs, requiring Clements to dive out of the way in order to avoid being hit. Immediately thereafter, the driver's door of the Renovo tow truck opened, striking Jacobs and knocking him down and under the truck where the dual rear wheels ran up his body across his legs, torso and chest, resulting in what proved to be fatal injuries. [4]

Monroe issued Commercial Auto Policy # CA 0012283, effective November 23, 2008 through November 23, 2009. The policy listed Renaissance Recovery Solutions, LLC as "named insured." An endorsement was later issued, stating that "[t]he Named Insured . . . is amended to include . . . " Renovo Services along with

---

[4] Michael Brown pled guilty to vehicular homicide and criminal damage to property in the second degree. Victoria Brown pled guilty to simple battery and criminal damage to property in the second degree.

Emerald Ventures, Inc. and Skip Pros LLC. Skip Pros LLC is also a sister company of Renovo.

Item Two of the policy declarations provides liability coverage for covered autos listed in Symbols 8 and 9 of the Business Auto Coverage Form. Symbol 9, at issue here, states:

> Nonowned "Autos" Only. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees," partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs.

This form further states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations."

And Section V of the policy, labelled "Definitions," provides in subsection G: "'Insured' means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, *the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or 'suit' is brought.*" (Emphasis supplied.)

9

Section II, "Liability Coverage," provides in subsection A. "Coverage" that "[w]e will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"

Sub-subsection 1, "Who Is An Insured," states that "[t]he following are 'insureds'; a. You for any covered 'auto'. b. Anyone else while using with your permission a covered 'auto' you own, hire or borrow . . . .[5] c. Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability."

**Case No. A12A2421**

1. Renaissance's first two enumerations are that the trial court erred in denying its motion for partial summary judgment and granting Monroe's motion for summary judgment on the issue of insurance coverage.

---

[5] "[A] covered 'auto' you own, hire or borrow" is directly contradictory to the definition of "non-owned" auto in symbol 9, set out above.

The trial court, in finding that Renaissance was not covered for this incident, concluded that because both Renovo and Renaissance were insureds under the policy and Renovo owned the tow truck at issue, the tow truck was not a "non-owned" auto as to both insureds. Further, the trial court concluded that the tow truck was not being used in connection with Renaissance's business.

We find, as did the trial court, that, since the policy was issued and delivered in Michigan, Michigan substantive law applies to interpretation of the policy. *Convergys Corp. v. Keener*, 276 Ga. 808, 811 (582 SE2d 84) (2003) (Georgia adheres to the traditional rule of lex loci contractus, i.e., contracts are governed by the law of the place where they were made.)

An insurance policy is an agreement between parties that a court interprets "much the same as any other contract" to best effectuate the intent of the parties and the clear, unambiguous language of the policy. *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566 (489 NW2d 431) (1992). In doing so, the court looks to the contract as a whole and gives meaning to all of its terms. Id., citing *Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 694 (327 NW2d 286 (1982).

"Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and,

second, a decision regarding whether an exclusion applies to negate coverage." *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 382 (565 NW2d 839) (1997). The insurer bears the burden of proving an absence of coverage. *Fresard*, supra.

a) In determining coverage here, we must determine whether the trial court was correct in determining that if *any* insured owned the tow truck, it was not a "non-owned" auto as to any other insured. We conclude, as urged by Renaissance, that this decision by the trial court was incorrect.

The purpose of the separation-of-insured clauses, such as that contained in Section V, subsection G above, is to provide each insured with separate coverage, as if each were separately insured with a distinct policy. *Chrysler Ins. Co. v. Greenspoint Dodge*, 297 SW3d 248, 253 (Tex. Sup. Ct. 2009). See also *Northwest G. F. Mutual Ins. Co. v. Norgard*, 518 NW2d 179, 182 (N. D. Sup. Ct. 1994). As held in *Commercial Standard Ins. Co. v. American General Ins. Co.*, 455 SW2d 714, 721 (Tex. Sup. Ct. 1970),

> 'The insured' does not refer to all insureds; rather, the term is used to refer to each insured as a separate and distinct individual apart from any and every other person who may be entitled to coverage thereunder. When a claim is made against one who is an 'insured' under the policy, the latter is 'the insured,' for the purpose of determining the company's obligations with respect to such claim.

12

We find, under the circumstances here, that the terms "unowned auto" and "named insured," as used by Monroe in the policy, are ambiguous, see *Oida Risk Retention Group, Inc. v. Williams*, 579 F3d 469, 472 (5th Cir. 2009), and, therefore, the policy must be construed in favor of the insured. *Farm Bureau Mut. Ins. Co. v. Nikkel,* 460 Mich. 558, 566 (596 NW2d 915) (1999)*; Arco Indus. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 402-403 (531 NW2d 168) (1995).

In considering this issue, we are persuaded by the decision of the Indiana Court of Appeals in *Indiana Ins. Co. v. O.K. Transport,* 587 NE2d 129 (Ind. Ct. App. 1992). There, the court considered an insurance policy which listed two separate legal entities controlled by the same family as the "insured." The business insurance policy issued by Indiana Insurance Company (Indiana) listed "OK Transport, Inc." and "Oscar Koester & Sons" (partnership) as the insured. The claim arose when a pick-up owned by Oscar Koester & Sons and driven by Johnnie Koester, acting within the scope of his employment for O.K. Transport, struck and injured another motorist. After the consent judgment was paid by the auto liability insurance company to the injured parties, the injured parties sought the excess unpaid judgment from Indiana. Id. at 130.

The question was whether each entity was considered a separate insured and whether the pick-up was a "nonowned" vehicle as to O.K. Transport. The trial court, affirmed by the court of appeals, relied on the policy's clause that found "the insurance afforded applies separately to each insured who is seeking coverage or against whom a claim is made or suit is brought." Id. at 131. Because the "named insured" provision listing two entities did not reveal whether the two were to be considered as a single entity or as two separate entities, the policy was construed in favor of the insured and it was concluded that a vehicle owned by one but not the other would be covered as to the non-owning insured.

We adopt this reasoning and, therefore, conclude that the trial court erred in finding that the tow truck was not a "non-owned" auto as to Renaissance, and thus Renaissance was entitled to partial summary judgment on this ground.

b) We also find that the trial court erred in concluding that the tow truck was not being used "in connection with" the business of Renaissance.

In determining whether the tow truck was used "in connection with" the business of Renaissance, the trial court relied on the standard set out in *CMH Homes, Inc. v. United States Fidelity & Guaranty Co.*, 2007 U.S. Dist. LEXIS 12795 (E.D. Tenn. 2007), with which we agree. That case also involved an issue in an insurance

14

policy using the same "non-owned auto" language and found that "the key language in the non-owned auto section of the policy is 'used in connection with your business.'" Id. § III. Two factors were identified to determine whether a non-owned auto was used "in connection with [an insured's] business." "The first factor is the extent to which the vehicle at issue was used in the course and scope of the insured's business. The second factor in determining whether the use was 'in connection with' the insured's business is the extent to which an insured held or exerted a right of control over the vehicle and its driver." Id. (Citations omitted.) Because the phrase "in connection with the business" of Renaissance is not defined in the Monroe policy, it is to be given its ordinary and plain meaning, avoiding a technical or strained construction, and any ambiguity is to be resolved in favor of Renaissance. *Hosking v. State Farm Mut. Automobile Ins. Co.*, 198 Mich. App. 632, 633 (499 NW2d 436) (1993).

In examining these two factors, we note that in the trial court's unappealed order denying summary judgment on the issue of wrongful repossession, the trial court cited the 2006 agreement between Nuvell and Renaissance in which Renaissance agreed that it would "repossess vehicles and/or attempt to locate customers or vehicles" and that it would act as an independent contractor "when

15

making vehicle repossessions and recoveries on behalf of Nuvell." The trial court also found in this order that "Renaissance, after having been contacted by Renovo and advised of the developments, directed Renovo to instruct Brown to pick up the Clements' Truck that day."

In the order appealed, however, the trial court concluded that Renaissance was "a forwarder that acts as a middle man between finance companies and repossession companies. [Renaissance]'s business does not include *physically repossessing* vehicles. That is Renovo's business." (Emphasis supplied.) Carried to its logical extreme, however, the trial court's reasoning would also preclude finding that Renovo was in the repossession business because it subcontracted with Michael Brown as an independent contractor to go and *physically repossess* the vehicle, even though the tow truck was owned by Renovo and leased to Brown. These facts would indicate that Renovo was in the wrecker leasing business.

Nuvell's corporate representative deposed that Nuvell contracted with Renaissance to handle repossessions for eight companies whose accounts Nuvell serviced. Renaissance's corporate representative deposed that "[a] forwarding company is a repossession management company that accepts orders from lenders, assigns those orders out to a network of agencies that deploy trucks required to pick

16

up collateral, automotive or rolling stock." He further explained that "the value proposition of a company like Renaissance . . . is that we are the hub of information for the lender." Both the tow truck driver and a customer, such as Nuvell, communicated with each other regarding repossession of vehicles through Renaissance, as occurred with Clements' truck.

Viewed with all inferences in favor of Renaissance, we conclude that the tow truck was being used "in connection with the business" of Renaissance and that Renaissance was entitled to summary judgment on this issue.

2. Renaissance also urges that the trial court erred in granting Monroe's motion for summary judgment because the indemnity agreement between Nuvell and Renaissance is an "insured contract" under the policy, thereby providing coverage.[6]

By order of November 15, 2011, the trial court granted granted Nuvell's motion for partial summary judgment in Case No. A12A1484, the Jacobs case, finding that Nuvell was entitled to contractual indemnification by Renaissance for all claims against it. That order is also not the subject of any appeal and is binding between the

---

[6] Based on our rulings in Division 1, we need not consider Renaissance's third enumeration regarding disputes of fact.

17

parties.[7] OCGA § 9-12-40; see *Hall v. Hall*, supra; *Hooper v. Harris*, supra. The March 1, 2006 agreement between Nuvell and Renaissance provided in paragraph 8 that

> [c]ontractor [Renaissance] will indemnify and hold harmless [Nuvell] . . . from any and all liabilities, losses, damages costs, and expenses (including reasonable attorneys' fees and legal expenses), suits, and/or causes of action . . . arising out of [Renaissance's] negligent, reckless, or willful misconduct in the performance of any Services under this Agreement, and any Services performed by any entity, person or company to which Contractor assigns Services whether with or without knowledge of [Nuvell], and from [Renaissance's] breach of any covenant, representation or warranty set forth in this agreement or in [Nuvell's] Policy on Repossession and Location Information.

> The insurance policy provides in Section II, subsection "B. Exclusions" that

> [t]his insurance does not apply to any of the following: . . . 2. Contractual Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages: a. Assumed in a contract or agreement that is an '*insured contract*' provided that the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement; or b. That the 'insured' would have in the absence of the contract or agreement. (Emphasis supplied.)

---

[7] Nuvell's common law claim for indemnification against Renovo remains pending below.

In Section V-Definitions, subsection H 5, "insured contract" is defined as "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another to pay for 'bodily injury' or 'property damage' to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement." According to Section IV, subsection B 5, "Other Insurance," sub-subsection c. provides that liability coverage is primary for any liability assumed under an "insured contract."

Therefore, Nuvell's liability assumed by Renaissance under the indemnity agreement shifts to Monroe because coverage under the Monroe policy applies to any liability of Renaissance resulting from the lawsuit. Accordingly, Renaissance was entitled to summary judgment on this ground also. Cf. *State Farm Fire &c. Co. v. Zurich Ins. Co.*, 111 F3d 42, 44 (6th Cir. 1997).

## Case Nos. A12A1484 and A12A1485

3. Because we have concluded in Divisions 1 and 2 that Monroe is ultimately liable to Renaissance and, through the indemnity agreement, to Nuvell, we need not address the merits of Nuvell's appeals, as they have been rendered moot.

"Given that there is no existing controversy remaining between the parties, 'any decision regarding denial of [Nuvell's motion for summary judgment] would be of

19

no benefit to [Nuvell], thereby rendering the issues raised in [these] appeal[s] moot." (Citations omitted.) *Santasiero v. Abernathy*, 304 Ga. App. 569, 571 (1) (696 SE2d 352) (2010).

*Appeals dismissed in Case Nos. A12A1484 and A12A1485. Judgment reversed in Case No. A12A2421. Barnes, P. J., and McFadden, J., concur.*